# UNITED STATES
### v.
## Alfred E. S. O'NEILL
### Crim. No. 78–286.

United States District Court,
E. D. Pennsylvania.

Jan. 31, 1980.

John F. Penrose, Asst. U. S. Atty., Philadelphia, Pa., for United States.

Joseph M. Miller, Asst. Defender, Philadelphia, Pa., for defendant.

## MEMORANDUM

POLLAK, District Judge.

Alfred E. Smith O'Neill was indicted on multiple counts of bank fraud and mail fraud. A trial lasting several weeks resulted in a verdict of guilty on each of the fifty-two counts submitted to the jury. Following the verdict, defendant moved to dismiss the indictment; the motion was grounded on allegations of prosecutorial misconduct. An evidentiary hearing was held to explore the factual issues raised by that motion. The record thus developed yields a substantially uncontroverted scenario of the underlying events. On the basis of that scenario, I conclude that defendant O'Neill's motion must be denied.

### I.

In the fall of 1978, following his indictment, O'Neill reportedly approached a person who seemed likely to be a Government witness. That reported approach had led the United States Attorney's Office to open another file on O'Neill—this one relating to a possible obstruction of justice charge. Prosecution concern mounted when, some weeks later, subsequent to the Government's giving O'Neill's attorney a list of persons the Government expected to call as witnesses at the fraud trial, agents of the Federal Bureau of Investigation advised Assistant United States Attorneys Edward S. G. Dennis and Luther E. Weaver, who were to try the case, that O'Neill was attempting to arrange a meeting with Charles Allen, an underworld "hitman." Since, unbeknownst to O'Neill, Allen happened to be a Government informant, Messrs. Dennis and Weaver felt that it would be prudent to permit Allen to meet with O'Neill, with a view to learning via Allen whether O'Neill was in fact planning a course of intimidation of Government witnesses.

Accordingly, on December 28, 1978, Dennis, Weaver, and Assistant United States Attorney Joel Friedman—the attorney who is in charge of the local "Strike Force," for whom Allen had been an informant for some time—met with Judge Broderick to request judicial approval of the proposed Allen-O'Neill meeting. Judge Broderick agreed to allow the meeting to proceed, and to be consensually monitored by Allen if the Government wished, with the proviso that the trial team—Dennis and Weaver, plus any case agents or other law enforcement personnel working under their direction—were to be insulated from any information that was a product of that meeting. The meeting took place and was recorded by Allen.

On January 8, 1979, Joel Friedman and United States Attorney Peter Vaira presented a transcript of that meeting to me for *in camera* inspection, accompanied by a request for either (1) a continuance of the upcoming trial, until such date in Feb-

ruary as Allen's informant status would be publicly disclosed, or (2) if I decided the trial had to proceed on schedule, a protective order specifying that the Allen-O'Neill transcript would not have to be disclosed to the defense prior to Allen's February unveiling. After taking the matter under advisement, I granted the requested protective order on January 15.

On January 16, very shortly before the trial was scheduled to begin, Friedman learned that O'Neill had again contacted Allen to propose a second meeting. Friedman and F.B.I. Agent Perry requested permission to monitor this second conversation. I denied their application. Friedman agreed that Allen would not meet with O'Neill, would not tape any more phone calls from O'Neill, and would not report any such calls to the F.B.I. unless the call concerned illegal activity unrelated to this case.

To carry out my directive, Friedman instructed Perry that the F.B.I. was to tape no more Allen-O'Neill interactions and that, indeed, Allen was to avoid any further contact with O'Neill. Perry relayed Friedman's instructions to Agent McMullin, who, in turn, informed Agent Handy that further recordings were prohibited; apparently, however, Handy was not fully advised that Friedman's instructions also imposed an obligation on Allen not to disclose to the F.B.I. any further contacts with O'Neill. Handy communicated his understanding to Allen.

On January 19, Allen told Agent Tamm that O'Neill had called and requested a further meeting. In accordance with the F.B.I.'s policy of requiring that tapings of this sort have the prior approval of the United States Attorney's Office, Tamm attempted to gain clearance for that meeting. Tamm called Friedman, who was out of town. Tamm spoke to Agent Brown, who was unaware of the court's directive and Friedman's instructions pursuant thereto. Then Tamm spoke to Handy, who said that he thought such contact had been prohibited but suggested that Tamm might seek consultation higher up. Tamm called his supervisor who was unavailable. Then he called Dennis who, designedly isolated from matters relating to Allen and hence unaware of the Friedman-Perry meeting with me, could offer Tamm no guidance.

Finally, Tamm reached United States Attorney Vaira at his home. Vaira authorized the taping. On January 21, 1979, Allen met with and recorded a second conversation with the defendant.

When Vaira approved this second Allen-O'Neill contact, he had no knowledge that I had prohibited such meetings. Vaira did know that Friedman had intended to apply to me for approval of a second meeting; but Vaira had not been advised by Friedman of the result of that application. As Friedman forthrightly testified, he simply forgot to tell Vaira.

Agent Tamm's inability to get proper guidance from the many individuals to whom he turned for advice was due (1) in substantial measure, to failures of communication which should have been avoided, and (2) also in substantial measure, to the quarantine from knowledge of the Allen-O'Neill interactions which had been imposed on the trial team in an effort to avoid potential Sixth Amendment problems suggested by *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

Defendant concedes that this history does not evidence intentional disregard of my directive. Nor does defendant contend that the Government's action tainted the ensuing trial. Rather, defendant asserts that the Government's mistakes—failing to inform Allen of the restrictions placed on relating his conversations with O'Neill to the F.B.I., and allowing the second Allen-O'Neill meeting to be recorded—constituted (a) "prosecutorial misconduct of such magnitude as to render dismissal of the indictment the only appropriate remedy," and (b) a violation of the Disciplinary Rule of the Code of Professional Responsibility requiring professional obedience to the rulings of a tribunal, D.R. 7–106(A), for which, likewise, dismissal of the indictment is the proper sanction.

In aid of this motion, defendant offers the principle that "The staff lawyers in a prosecutor's office had the burden of 'letting the left hand know what the right hand is doing' or has done." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971).

It cannot be seriously disputed that the concurrent actions and omissions of several Government lawyers and investigators combined to bring about a breach of a clear judicial directive—a breach for which the Government as an entity is accountable. Notwithstanding that it was "a result of negligence . . . it [was] the responsibility of the prosecutor." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

The breach of this court's directive does not, however, entitle the defendant to dismissal of the indictment. In the cases principally relied on by O'Neill, the Government's misconduct had a demonstrable adverse impact on the rights of a criminal defendant. In each instance, the judicial response was designed to relieve the prejudice suffered by the defendant.

In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), prejudice took the form of denying the defendant valuable impeachment evidence likely to have affected the jury verdict. In *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), the Government's error deprived the defendant of the benefit of a plea agreement. In *United States v. Ott*, 489 F.2d 872 (7th Cir. 1973), the prosecutor's misstatements were designed to influence the trial judge in the exercise of his discretion. And in *United States v. Barket*, 530 F.2d 189 (8th Cir. 1976), the failure of the Justice Department to inform the local United States Attorney of a possible basis for criminal charges against the defendant was found to be culpable government conduct, causing unreasonable preindictment delay and, thus, in combination with the intervening loss of beneficial testimony, was held to have denied defendant the due process of law.

Had there been any communication of the information gained from either Allen-O'Neill conversation to members of the trial team, defendant's Sixth Amendment claim would be substantial. *Massiah v. United States, supra; United States v. Levy*, 577 F.2d 200 (3d Cir. 1978). Compare *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. Natale*, Criminal No. 78–226, E.D.Pa., December 28, 1979 (Van Artsdalen, J.). But the record is clear that the successful isolation of the trial team from the details of O'Neill's interactions with Allen—the quarantine which had contributed to the Government's blunder—forestalled all potential prejudice to defendant's trial.

### II.

Defendant attempts to bridge the gap between the Government's misfeasance and the remedy which he seeks by relying on the decision of the Third Circuit in *United States v. Morrison*, 602 F.2d 529 (1979). *Morrison* involved repeated forceful and willful intrusions by government agents into a defendant's home—intrusions manifestly designed to destroy the confidence of the defendant in her attorney. Although the defendant did not succumb to the Government's intimidation, and thereby avoided the intended prejudice, the Court of Appeals found the Government's misconduct so egregious as to require dismissal of defendant's indictment as the appropriate, if extraordinary, judicial response.

For the Government's intentional breach of a judicial order, the *Morrison* remedy might indeed be available in a proper circumstance. But the Government's errors in this case have no element of intentionality. Nor does it add to the weight of defendant's claim that the very basic obligation to obey judicial rulings has been encapsulated, and made independently binding on attorneys, by the Code of Professional Responsibility. What the Government did was wrong; but it was inadvertent, and it did not prejudice the capacity of O'Neill and his able trial counsel to prepare and present O'Neill's defense.

### III.

The defendant's motion to dismiss the indictment will thus be denied.